**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

In re:                                             Chapter 11

WILSON MANIFOLDS, INC.                  Case No.      18-21658-RBR

_____Debtor(s)_____/

**PLAN OF REORGANIZATION FOR WILSON MANIFOLDS, INC.**

**Dated:       May 28, 2019**

## ARTICLE I
## SUMMARY

This Chapter 11 plan (the "Plan") proposes to treat all allowed claims against and all allowed interests in Wilson Manifolds, Inc. (the "Debtor" or "Wilson Manifolds"). The Plan provides for 2 classes of secured claims and four classes for unsecured claims. Reference is made to the Disclosure Statement in Support of the Plan (the "Disclosure Statement") for further discussion of the Plan and the Debtor-in-Possession's financial circumstances.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)**

## ARTICLE II
## DEFINITIONS

*"Allowed Claim(s)"* shall mean any Claim which is not a Disputed Claim of a Disputed Claim which has been allowed by a final order of the Court.

*"BB&T"* shall mean Branch Banking & Trust.

*"Ballot Deadline"* shall mean the last day established by order of the Court for filing a Ballot with the Clerk of the Court.

*"Biostem"* shall mean Biostem Technologies, Inc.

*"Cash"* shall mean legal tender of the United States of America.

*"Claim(s)"* shall mean (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed or contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; and/or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured;

*"Class"* shall mean a group of Claims classified together pursuant to Article IV of the Plan.

*"Code"* shall mean the Bankruptcy Code, 11 U.S.C. §§ 101 et. seq.

*"Confirmation"* shall mean the entry by the Court of the Confirmation Order.

*"Confirmation Date"* shall mean the date on which the Clerk of the Court enters the Confirmation Order on the Docket.

*"Confirmation Order"* shall mean the order entered by the Court confirming the Plan, which shall contain such provisions as the Proponent desires and shall otherwise be in a form and substance

satisfactory to the Proponent.

*"Court"* shall mean the United States Bankruptcy Court for the Southern District of Florida, including any Bankruptcy Judge thereof, and any court having competent jurisdiction to hear appeals from the Bankruptcy Judges thereof.

*"Disputed Claim(s)"* shall mean any Claim for which an Allowed Amount has not yet been determined, and with respect to which an objection has been interposed on or prior to the Confirmation Date or such other date as may be fixed by the Court and which objection has not been withdrawn or determined by a Final Order, or which is listed on the Schedules as disputed, contingent or unliquidated.

*"Distribution"* shall mean funds to be paid to holders of Claims pursuant to the Plan.

*"Distribution Date"* shall mean the dates upon which Distributions may be made pursuant to the Plan.

*"Effective Date"* shall mean the fifteenth (15th) day after the entry of the Confirmation Order so long as no appeal is filed. In the event of an appeal, absent the entry of a stay, the Effective Date shall be the fifteenth (15th) day after the entry of the Confirmation Order. In the event the Confirmation Order is stayed pending appeal, the Effective Date shall be the fifteenth (15th) day after the entry of a final order either lifting the stay or affirming the Confirmation Order.

*"Equity Interest"* and/or *"Interest"* shall include interests in any share of preferred stock, common stock, membership unit or other instrument evidencing ownership interest in the Debtor, whether or not transferable, and any option, warranty, right, contractual or otherwise, to acquire any such interest.

*"Executory Contract"* shall mean a contract or unexpired lease to which the Debtor is a party and that is executory within the meaning of section 365 of the Code.

*"Impaired"* shall mean an Allowed Claim that is Impaired within the meaning of section 1124 of the Code.

*The "IRS"* shall mean the Internal Revenue Service.

*The "IRS Claim"* shall mean Proof of Claim No. 5 filed by the IRS.

*The "IRS Priority Claim"* shall mean the portion of the IRS Proof of Claim which is an unsecured priority claim under 11 U.S.C. §507(a)(8).

*The "IRS Secured Claim"* shall mean the portion of the IRS Claim which is determined to be secured pursuant to 11 U.S.C. §506.

*"N & G"* shall mean N&G Investments, Ltd.

*The "N&G Claim"* shall mean Proof of Claim No. 10.

*"New Equity"* shall mean to Henry Van Vurst.

*"Petition Date"* shall mean September 21, 2018 the date on which the Debtor commenced this Case by filing a voluntary petition under Chapter 11 of the Code.

*"Plan Sponsor"* shall mean Keith Wilson.

"*Premises*" shall mean 4700 NE 11th Ave, Oakland Park, FL 33334.

*"Pre-petition"* shall mean prior to the Petition Date.

*"Professional"* shall mean any professional employed in this Case pursuant to sections 327, 328 or 1103 of the Code or otherwise pursuant to an order of the Court.

*"Proof of Claim"* shall mean a Claim filed in this Case and is reflected in the Court's register as having been filed.

*"Proponent"* shall mean the Debtor, the proponent of the Plan.

*"Rules"* shall mean the Federal Rules of Bankruptcy Procedure.

*"Secured Claim(s)"* shall mean a Claim secured by a Lien on property in which the Estate has an interest or that is subject to set-off under section 553 of the Code to the extent of the value of the interest attributable to such Claim in the Estate's interest in such property or to the extent of the amount subject to set-off.

"*TCF*" shall mean TCF Equipment Finance, a division of TCF National Bank.

*The "TCF Assumption Agreement"* shall mean the agreement filed at Docket Entry 54 in the Debtor's bankruptcy case.

*The "TCF Claim"* shall mean Proof of Claim No. 10 filed by TCF.

*"Unclaimed Funds"* shall have the meaning set forth in Section 5.2 of the Plan.

*"Unimpaired"* shall mean an Allowed Claim that is not Impaired within the meaning of section 1124 of the Code.

<u>**ARTICLE III**</u>
**TREATMENT OF ADMINISTRATIVE CLAIMS, U.S. TRUSTEE FEES AND PRIORITY TAX CLAIMS**

3.1    <u>Unclassified Claims</u>: Under 11 U.S.C. § 1123(a)(1), administrative expense claims and priority tax claims (other than 11 U.S.C. § 507(a)(8) claims) are not in classes.

3.2     Administrative Expense Claims: Each holder of an administrative expense claim allowed under 11 U.S.C. § 503 will be paid in full on the Effective Date of this Plan, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor. Included in the class of Administrative Expense Claims are professional fee and expense claims, which the Debtor estimate will be $50,000.00.

3.3     United States Trustee Fees:  All fees required to be paid by 28 U.S.C. §1930(a)(6) (U.S. Trustee Fees) will accrue and be timely paid until the case is closed, dismissed, or converted to another chapter of the Code. Any U.S. Trustee Fees owed on or before the Effective Date of this Plan will be paid on the Effective Date.

**ARTICLE  IV**
**TREATMENT AND CLASSIFICATION OF CLAIMS AND INTERESTS**
**UNDER THE PLAN**

For the purposes of this Plan, the classes of claims against or in the Debtor shall be as follows:

*Class 1* shall consist of the BB&T Claim.

*Class 2* shall consist of the N&G Claim;

*Class 3* shall consist of the TCF Claim;

*Class 4 shall* consist of the IRS Secured Claim.

*Class 5* shall consist of the IRS Priority Claim

Class 6 shall consist of all general Unsecured Claims;

*Class 7* shall mean the Equity Interests of the Debtor

**4.1.     Class 1 – BB&T Claim**

(a)     Description. Class 1 consists of the BB&T Claim.  BB&T has filed a proof of claim in the amount of $139,226.43.

(b)     Treatment.

    i.     **Payment.** The BB&T Claim shall be paid in full over a term of 72 months at the interest rate of 7.25%, resulting in monthly payments of $2,258.00. The payment shall begin the first day of the month following the Effective Date. In the event that BB&T's claim has been reduced due to receipt of Adequate Protection payments, BB&T shall provide the Debtor with an updated claim amount within 7 days of confirmation and the Debtor shall pay such amount over 72 months at 7.25%.

    ii.     **Prepayment.**  The Debtor may prepay the BB&T claim at any time without

penalty.

iii.    **Default**. Should a default occur, BB&T or its counsel shall provide written notice (the "Written Notice") of the default via e-mail to the Debtor at kwilson@wilsonmanifolds.com and its counsel Michael Hoffman, Esq. at mshoffman@hlalaw.com or to such other email address as the Debtor may provide to BB&T in writing. The Written Notice shall provide for 7 calendar days from the date of the Written Notice for the Debtor to cure the default. If the default has not been cured at the conclusion of the 7 calendar days, BB&T shall be entitled to enforce all default provisions in its loan documents and the injunctions provided by this Plan shall not apply.

(c)    Impairment. The Class 1 Claims are Impaired and are entitled to vote to accept or reject the Plan.

**4.2.    Class 2 – N&G Claim**

(a)    Description. Class 2 consists of the N&G Claim.  N&G has filed a proof of claim in the amount of $252,700.78. N&G currently leases the Premises to the Debtor on a month-to-month basis.

(b)    Treatment.

i.    **New Lease**. Effective on the earlier of date of the Confirmation Order or the date of the execution of a written lease, the Debtor and N&G shall enter into a new lease for the Premises. In the event a written lease is signed, the terms of such lease shall be controlling.  In the event no written lease is signed, the following terms shall apply:

- Term: 60 months.
- Rent: $6,998.84
- Commencement Date: The term shall commence on the first day of the month following entry of the confirmation order and conclude on the 60th month thereafter.

ii.    **Payment.**  N&G or its designee will receive a one-time gift from New Equity in the form of a transfer of $75,000 shares of Biostem. Upon receipt of such transfer, the N&G Claim shall be satisfied in full.

iii.    **Default**. Should a default occur, N&G or its counsel shall provide written notice (the "Written Notice") of the default via e-mail to the Debtor at kwilson@wilsonmanifolds.com and its counsel Michael Hoffman, Esq. at mshoffman@hlalaw.com or to such other email address as the Debtor may provide to N&G in writing. The Written Notice shall provide for 7 calendar days from the date of the Written Notice for the Debtor to cure the default. If the default has not been cured at the conclusion of the 7 calendar days, N&G shall be entitled to declare a default under the terms of the Plan and seek damages and/or eviction of the Debtor from its Premises.

(c)     Impairment. The Class 2 Claims are Impaired and are entitled to vote to accept or reject the Plan.

### 4.3.   Class 3 – TCF Claim

(a)     Description. Class 3 consists of the TCF Claim. TCF has filed a proof of claim in the amount of $567,940.68.

(b)     Treatment. The Debtor and TCF have executed a Joint Stipulation for Assumption of Lease, a copy of which is attached hereto as Plan Exhibit 1. The terms of such Joint

(c)     Impairment. The Class 3 Claims are Impaired and are entitled to vote to accept or reject the Plan.

### 4.4.   Class 4- Secured Claim of IRS

(a)     Description. Class 4 consists of the IRS Secured Claim. The Debtor has filed a motion to determine that the IRS secured claim is $92,203.20.

(b)     Treatment. The IRS Secured Claim shall be paid in full over a term of 60 months at the interest rate of 6%, resulting in monthly payments of $1,744.00. The payment shall begin the first day of the month following the Effective Date. In the event the IRS is determined to have a secured claim in an amount other than $92,203.20, such secured claim shall be paid at 6% over 60 months. Upon receipt of the final payment due hereunder, the IRS lien on the assets of the Debtor shall be deemed released and the IRS shall file such documents in the public records reflecting same. Should a default occur, the IRS or its counsel shall provide written notice (the "Written Notice") of the default via e-mail to the Debtor at kwilson@wilsonmanifolds.com and its counsel Michael Hoffman, Esq. at mshoffman@hlalaw.com or to such other email address as the Debtor may provide to IRS in writing. The Written Notice shall provide for 7 calendar days from the date of the Written Notice for the Debtor to cure the default. If the default has not been cured at the conclusion of the 7 calendar days, the IRS shall be entitled to declare a default under the terms of the Plan and pursue all available remedies provided by law.

(c)     Impairment. Class 4 is unimpaired, per 11 U.S.C. 1129(a)(9)(C)

### 4.5   Class 5- Priority Claim of IRS

(a)     Description. Class 5 consists of the IRS Priority Claim. Per the IRS' Proof of Claim, the IRS alleges a priority claim of $500.00.

(b)     Treatment. The IRS Priority Claim shall be paid in full in cash on the Effective Date.

(c)     Impairment. Class 5 is unimpaired.

### 4.6   Class 6 – General Unsecured Claims

(a)     Description. Class 6 consists of the Allowed general Unsecured Claims.

(b)     Treatment. In full satisfaction, settlement and release of Class 4 Claims, the holders of Allowed General Unsecured Claims shall receive a pro rata distribution of $35,000. $10,000 shall be paid by Keith Wilson in a lump sum payment and $25,000 shall be paid over two years through 4 biannual installments of $6,250.00. The first payment shall be made on the Effective date.

(c)     Impairment. The 6 5 Claims are Impaired and are entitled to vote to accept or reject the Plan.

### 4.6     Class 7 – Equity Interests

(a)     **Description.** As of the Petition Date, Keith Wilson owned 100% of the outstanding stock of the Debtor.

(b)     **Treatment**. On the earlier of the Effective Date or such other date as authorized by the Court, Keith Wilson shall convey 25% of his shares in the Debtor to the New Equity. Keith Wilson and the New Equity may own the Reorganized Debtor 75%/25%, respectively.

(d)     Impairment. The Class 7 Interests are Impaired and are entitled to vote to accept or reject the Plan.

## ARTICLE V
## PROVISIONS REGARDING VOTING, DISTRIBUTION, CLAIM ALLOWANCE

### 5.1     Voting of Claims and Equity Interests

The Bankruptcy Code entitles only holders of Impaired Claims or Equity Interests who receive some distribution under a proposed plan to vote to accept or reject that plan. Claims in Classes 1-10 are Impaired under this Plan. Holders of classes of Interests in Classes 11-12 that will receive no distributions under a proposed plan are conclusively presumed to reject that plan and, therefore, also not entitled to vote on it.

Any Ballot not filed by the Ballot Deadline and in accordance with the filing instructions on the Ballot pertaining to this Plan shall not be counted for voting purposes.

### 5.2     Method of Distribution under the Plan

Subject to Rule 9010, and except as otherwise provided in Section 5.3 of the Plan, all Distributions under the Plan shall be made by the Reorganized Debtor to the holder of each Allowed Claim or Allowed Equity Interest at the address of such holder as listed on the Schedules and/or Proof of Claim as of the Effective Date unless the Debtor or Reorganized Debtor has been notified in writing of a change of address, including by the filing of a proof of Claim by such holder that provides an address different from the address reflected on the Schedules.

Any payment of Cash made by the Reorganized Debtor pursuant to the Plan shall be made by check drawn on a domestic bank or by wire transfer.

Any payment or Distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

No payment of Cash less than One Hundred 00/100 Dollars ($100.00) shall be made by the Reorganized Debtor to any holder of a Claim unless a request therefore is made in writing to the Reorganized Debtor, or unless the Distribution is a final Distribution.

When any Distribution on account of an Allowed Claim pursuant to the Plan would otherwise result in a Distribution that is not a whole number, the actual distribution shall be rounded as follows: fractions of ½ or greater shall be rounded to the next higher whole number and fractions of less than ½ shall be rounded to the next lower whole number.

Any Distributions of Cash or other property under the Plan that is unclaimed for a period of six (6) months after the Distribution Date shall constitute Unclaimed Funds and any entitlement of any holder of any Claim to such distributions shall be extinguished and forever barred.

Unless otherwise provided herein, all initial Distributions and deliveries to be made on the Effective Date shall be made on the initial Distribution Date. Subsequent Distributions shall be made in accordance with the terms set forth in the Plan.

At the close of business on the Effective Date, the claims register shall be closed, and there shall be no further changes in the record holders of any Claims. The Debtor shall have no obligation to recognize any transfer of any Claims occurring after the Effective Date; *provided, however,* that the foregoing will not be deemed to prohibit the sale or transfer of any Claim after the Effective Date. The Debtor shall instead be entitled to recognize and deal for all purposes under the Plan with only those record holders as of the close of business on the Effective Date.

### 5.3    Distributions Withheld for Disputed General Unsecured Claims

### (a)    Establishment and Maintenance of Reserve

On the initial Distribution Date and each subsequent Distribution Date, the Reorganized Debtor shall reserve from the Distributions to be made on such dates to the holders of Allowed Claims, an amount equal to One Hundred Percent (100%) of the Distributions to which holders of Disputed Claims would be entitled under the Plan as of such dates if such Disputed Claims were Allowed Claims in their Disputed Claim Amounts or as estimated by the Debtor or the Court in accordance with Section 5.7 of the Plan (the "Disputed Claims Reserve").

### (b)    Property Held in Disputed Claims Reserve

Cash in the Disputed Claims Reserve shall (together with all dividends or other accretions or distributions thereon) be held in trust by the Reorganized Debtor for the benefit of the potential recipients of such Cash and shall not constitute property of the Reorganized Debtor.

### (c)    Distributions Upon Allowance of Disputed General Unsecured Claims

The holder of a Disputed Claim that becomes an Allowed Claim subsequent to any Distribution Date shall receive Distributions of Cash and any other consideration from the Disputed Claims Reserve from the Reorganized Debtor within ninety (90) days following the date on which such Disputed Claim becomes an Allowed Claim pursuant to a Final Order. Such Distributions shall be made in accordance with the Plan.

    (d)    **No Surplus Distributions to Holders of Allowed General Unsecured Claims**

To the extent that a Disputed Claim is not allowed or becomes an Allowed Claim in an amount less than the Disputed Claim Amount, the excess of Cash and any other consideration in the Disputed Claims Reserve over the amount of Cash and any other consideration actually distributed on account of such Disputed Claim shall vest in the Reorganized Debtor.

    (e)    **Expenses of Disputed Claims Reserve**

Except as otherwise ordered by the Court, the amount of any reasonable expenses incurred by the Reorganized Debtor on or after the Effective Date with respect to the Disputed Claims Reserve shall be paid by the Reorganized Debtor.

    **5.4**    **Procedures for Allowance or Disallowance of Disputed Claims**

    (a)    **Objections to and Resolution of Administrative Claims and General Unsecured Claims**

Except as to applications for allowance of compensation and reimbursement of expenses under sections 330 and 503 of the Code, the Debtor or the Reorganized Debtor shall have the exclusive right to make and file objections to Administrative Claims and General Unsecured Claims subsequent to the Effective Date. All objections shall be litigated to Final Order; *provided, however,* that following the Effective Date, the Reorganized Debtor shall have the authority to compromise, settle, otherwise resolve or withdraw any of their objections without approval of the Court. Unless otherwise ordered by the Court, the Debtor or the Reorganized Debtor shall file all objections to Claims and serve such objections upon the holder of the Claim as to which the objection is made as soon as is practicable, but in no event later than thirty (30) days after the Effective Date or such later date as may be approved by the Court. The Debtor or the Reorganized Debtor reserve the right to object to Administrative Claims as such claims arise in the ordinary course of business. The Reorganized Debtor shall bear all costs and expenses relating to the investigation and prosecution of Disputed Claims from and after the Effective Date.

    (b)    **No Distribution Pending Allowance**

Notwithstanding any other provision of the Plan, if any portion of a Claim is disputed, the full amount of such Claim shall be treated as a Disputed Claim for purposes of this Plan, and no payment or Distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim or Allowed Equity Interest (in whole or in part).

(c)    **Disallowed Claims**

All Claims held by persons or entities against whom the Debtor or Reorganized Debtor have commenced an Action under sections 542, 543, 544, 545, 547, 548, 549, and/or 550 of the Code, shall be deemed "disallowed" Claims pursuant to section 502(d) of the Code and holders of such Claims shall not be entitled to vote to accept or reject the Plan. Claims that are deemed disallowed shall continue to be disallowed for all purposes until the avoidance action against such party has been settled or resolved by Final Order and any sums due to the Estate from such party have been paid.

### 5.5    <u>Disbursing Agent</u>

The Reorganized Debtor, or such Person(s) as the Reorganized Debtor may designate with approval of the Court, will act as Disbursing Agent under the Plan with respect to all Distributions to holders of Claims and Equity Interests, and will make all Distributions required to be distributed under the applicable provisions of the Plan. Any Disbursing Agent may employ or contract with other entities to assist in or make the Distributions required by the Plan. Each Disbursing Agent will serve without bond, and each Disbursing Agent, other than the Reorganized Debtor, will receive, without further Court approval, reasonable compensation for distribution services rendered pursuant to the Plan and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services from the Reorganized Debtor on terms acceptable to the Reorganized Debtor. The Reorganized Debtor shall hold all reserves and accounts pursuant to the Plan, the Disputed Claims Reserve.

### 5.6    <u>Estimations of Claims</u>

For purposes of calculating and making Distributions under the Plan, any Claimholder with a Disputed Claim is not entitled to vote on the Plan unless said Claimholder has its Claim estimated by the Court. The Debtor and the Reorganized Debtor may at any time request that the Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Code or otherwise regardless of whether the Debtor or Reorganized Debtor previously objected to such Claim or whether the Court has ruled on any such objection, and the Court will retain jurisdiction to estimate any Claim at any time during litigation concerning such objection to any claim, including without limitation, during the pendency of any appeal relating to any such objection. In the event that the Court estimates any contingent or unliquidated claim, the amount so estimated shall constitute either the Allowed Amount of such Claim or a maximum limitation on the amount of such Claim, as determined by the Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtor or the Reorganized Debtor may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Court.

### 5.7    <u>No Recourse</u>

Notwithstanding that the Allowed Amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Code and Rules or is Allowed in an amount for which after application of the payment priorities established by the Plan there is insufficient value to provide a recovery equal to that received by other holders of Allowed Claims in the respective Class, no Claimholder shall have recourse against the Disbursing Agent, the Debtor, the Reorganized Debtor,

or any of their respective professionals, consultants, officers, directors or Affiliates or their respective successors or assigns, or any of their respective property. However, nothing in the Plan shall modify any right of a holder of a Claim under section 502G) of the Code. THE ESTIMATION OF CLAIMS AND ESTABLISHMENT OF RESERVES UNDER THE PLAN MAY LIMIT THE DISTRIBUTION TO BE MADE ON INDIVIDUAL DISPUTED CLAIMS, REGARDLESS OF THE AMOUNT FINALLY ALLOWED ON ACCOUNT OF SUCH DISPUTED CLAIMS.

### 5.8    Amendments to Claims

After the Confirmation Date, a Claim may not be amended without the authorization of the Court. Any amendment to a Claim filed after the Confirmation Date shall be deemed disallowed in full and expunged without any Action by the Debtor, the Reorganized Debtor or the Estate, unless the Claim holder has obtained prior Court authorization for the filing of such amendment.

### 5.9    Post-Petition Interest on Claims

Unless expressly provided in the Plan, the Confirmation Order, or any contract, instrument, release, settlement, or other agreement entered into in connection with the Plan or required by applicable law, Post-Petition Interest shall not accrue on or after the Petition Date on account of any Claim.

### ARTICLE VI
### PROVISIONS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES

6.1    Rejection of Executory Contracts and Unexpired Leases.  Pursuant to sections 365(a) and 1123(b)(2) of the Code, all Executory Contracts and unexpired leases between the Debtor and any Person shall be deemed rejected by the Debtor as of the Effective Date, except for any Executory Contract or unexpired lease (i) which previously has been assumed or rejected pursuant to an order of the Court entered prior to the Effective Date, (ii) as to which a motion for approval of the assumption or rejection of such Executory Contract or unexpired lease has been filed and served prior to the Effective Date, (iii) are for an insurance contract; (iv) which is listed on an assumption list which shall be filed with the Court and served on the affected parties by no later than twenty (20) days prior to the deadline to submit Ballots; *provided, however,* that the Debtor or Debtor shall have the right, on or prior to the Confirmation Date, to amend the assumption list to delete any Executory Contract or unexpired lease there from or add any Executory Contract or unexpired lease thereto, in which event such Executory Contract(s) or unexpired lease(s) shall be deemed, respectively, assumed or rejected. The Debtor shall provide notice of any amendments to the Assumption list to the non-Debtor parties to the Executory Contracts and unexpired leases affected thereby. The listing of a document on the Assumption list shall not constitute an admission by the Debtor or Reorganized Debtor that such document is an Executory Contract or an unexpired lease or that the Debtor or Reorganized Debtor has any liability thereunder.

### ARTICLE VII
### MEANS FOR IMPLEMENTING THE PLAN

### 7.1   General

Upon confirmation of the Plan, and in accordance with the Confirmation Order, the Debtor,

as the case may be, will be authorized to take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan. In addition to the provisions set forth elsewhere in the Plan, the following shall constitute the means for implementation of the Plan.

**7.2     The Reorganized Debtor**

Except as otherwise provided in the Plan, on the Effective Date of the Plan, all Assets of the Debtor shall be vested in the Reorganized Debtor. The Reorganized Debtor shall assume all of the Debtor' rights, obligations and liabilities under the Plan.

**7.3     Funding**

The Plan shall be funded through cash earned by the Reorganized Debtor, the gift from New Equity and the gift from Keith Wilson.

**7.4     Corporate Action**

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the member of the Debtor or the Reorganized Debtor shall be deemed to have occurred and shall be in full force and effect from and after the Effective Date pursuant to the laws of the State of Florida, and other applicable limited liability company law of the jurisdiction in which the Reorganized Debtor is incorporated, without any requirement or further action by the members of the Debtor or the Reorganized Debtor. On the Effective Date or as soon thereafter as is practicable, the Reorganized Debtor shall, if required, file any necessary documents with the secretary of the state of the state in which the Reorganized Debtor are organized.

**7.5     Continued Corporate Existence**

The Reorganized Debtor shall continue to exist after the Effective Date with all powers of limited liability companies under the laws of the State of Florida and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under Florida law; and, following the Effective Date, the Reorganized Debtor may operate its business free of any restrictions imposed by the Bankruptcy Code, the Bankruptcy Rules or by the Court, subject only to the terms and conditions of this Plan and Confirmation Order. After the Effective Date, the Reorganized Debtor may operate its business, and may use, acquire, and dispose of its property, free of any restrictions of the Code and Rules. Upon the Effective Date, the Reorganized Debtor shall be owned 100% by the Plan Sponsor or such other person or entity as designated by the Plan Sponsor.

**7.6     Section 1146(a) Exemption**

Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security under the Plan, or the making, delivery, or recording of an instrument of transfer in connection with (a) the sale of the Property and (b) financing incurred in connection with the Purchaser's acquisition of the Property, shall not be taxed under any law imposing a stamp or similar tax, including but not limited to any documentary stamp taxes or intangible taxes, whether on any deed, leasehold, assignment, promissory note, security agreement or mortgage.

### 7.7    Revesting of Assets

Except as otherwise provided in the Plan, pursuant to section 1141 of the Code, the Property of the Estate of the Debtor, including, without limitation, the Actions shall revest in the Reorganized Debtor on the Effective Date, free and clear of all Liens, Claims and Equity Interests of holders of Claims and Equity Interests, except as otherwise provided in the Plan or the Confirmation Order.

### 7.8    Causes of Action

As of the Effective Date, pursuant to section 1123(b)(3)(B) of the Code, any and all Actions accruing to the Debtor and Debtor in Possession, including, without limitation, actions under sections 510, 542, 544, 545, 547, 548, 549, 550, 551 and 553 of the Code, shall become Assets of the Reorganized Debtor, and the Reorganized Debtor shall have the authority to commence and prosecute such Actions for the benefit of the Estate. Specifically, the Reorganized Debtor shall continue to prosecute any Action pending on the Effective Date.

Further, section 547 of the Code enables Debtor in possession to avoid transfers to a creditor, based upon an antecedent debt, made within ninety (90) days of the Petition Date, which enables the creditor to receive more than it would under liquidation. Creditors have defenses to the avoidance of such preferential transfers based upon, among other things, the transfers having occurred as part of the Debtor' ordinary course of business, or that subsequent to the transfer the creditor provided the Debtor with new value. There were no transfers made to ordinary creditors within ninety (90) days prior to the Petition Date in excess of $5,850 to one payee. There were no transfers made to Insiders within more than one (1) year prior to the Petition Date.

After the Effective Date, the Reorganized Debtor shall have the authority to compromise and settle, otherwise resolve, discontinue, abandon or dismiss all such Actions with the approval of the Court. In order to obtain Court approval of a settlement, the Reorganized Debtor shall file and serve on all known Creditors, a motion to approve the settlement, pursuant to Rule 9019, to give the Creditors the opportunity to review any such proposed settlement. Prior to the Confirmation Hearing, the Debtor shall file a schedule of potential avoidance actions, if any.

### 7.9    Dismissal of Certain Claims

Within 5 business days after the effective date BAC Florida and Setai Venture shall dismiss, with prejudice all litigation pending against the Debtor.

### 7.10   Discharge

Commencing on the Effective Date, except as otherwise provided in the Plan, all holders of Claims and Interests shall be precluded forever from asserting against the Debtor' Estates, the Reorganized Debtor or their respective assets, any other or further liabilities, lien obligations, claims or equity interest, arising or existing prior to the Effective Date, that was or could have been the subject of any Claim or Interest, whether or not allowed. As of the Effective Date, the Reorganized Debtor shall be discharged, released from and shall hold the assets received or retained by and pursuant to this Plan, free and clear of all liabilities, liens, claims or obligations or other claims of any nature of the Debtor or their Estates except as otherwise provided herein.

## ARTICLE VIII
## CONFIRMATION

### 8.1    Conditions Precedent to Confirmation

The Plan shall not be confirmed by the Court unless and until the following conditions shall have been satisfied or waived pursuant to Section 8.2 of the Plan:

(i)    The Confirmation Order shall be in form and substance reasonably acceptable to the Debtor and include, among other things, a finding of fact that the Debtor, the Reorganized Debtor, and its respective present and former members, officers, directors, employees, advisors, attorneys, and agents acted in good faith within the meaning of and with respect to all of the Actions described in section 1125(e) of the Code and are, therefore, not liable for the violation of any applicable law, rule or regulation governing such Actions; and

(ii)    All exhibits to the Plan, including those to be contained in any plan supplement, shall be in form and substance reasonably acceptable to the Debtor and approved by the Court.

### 8.2    Conditions Precedent to Effectiveness

The Plan shall not become effective unless and until the following conditions have been satisfied or waived pursuant to this Section of the Plan:

(i)    The Confirmation Order shall have been entered and shall be a Final Order (with no modification or amendment thereof), and there shall be no stay or injunction that would prevent the occurrence of the Effective Date;

(ii)    The statutory fees owing to the United States Trustee shall have been paid in full;

(iii)    All other Actions, authorizations, filings consents and regulatory approvals required (if any) shall have been obtained, effected or executed in a manner acceptable to the Debtor and remain in full force and effect or, if waivable, waived by the Person or Persons entitled to the benefit thereof.

### 8.3    Effect of Failure of Conditions

If each condition to the Effective Date specified in the Plan has not been satisfied or duly waived within ninety (90) days after the Confirmation Date, then upon the filing of a motion by the Debtor made before the time that all conditions have been satisfied or duly waived, the Confirmation Order will be vacated by the Court; *provided, however,* that notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived before the Court enters an order granting the relief requested in such motion. If the Confirmation Order is vacated, the Plan shall be deemed null and void in all respects, including without limitation the release of Claims pursuant to section 1141 of the Code and the assumptions or rejections of Executory Contracts and unexpired leases as provided by the Plan, and nothing contained herein shall (1) constitute a waiver or release of any Action by, or Claims against, the Debtor or (2) prejudice in any manner the rights of the Debtor.

### 8.4    Waiver of Conditions

The Debtor may waive one or more of the conditions precedent to confirmation of the Plan, or the condition precedent to effectiveness of the Plan set forth in Section 8.02 of the Plan. The Debtor may waive in writing one or more of the other conditions precedent to confirmation and effectiveness of the Plan, without further notice to parties in interest or the Court without a prior hearing.

### 8.5    Best Interest Test and Liquidation Analysis

Notwithstanding acceptance of the Plan by each Impaired Class, in order to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each holder of a Claim or Interest in any such Impaired Class who has not voted to accept the Plan. Accordingly, if an Impaired Class does not unanimously accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that each such Class member would receive if Debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date.

To estimate what members of each Impaired Class of unsecured creditors and equity security holders would receive if the Debtor were liquidated under Chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from Debtor' Assets if the Chapter 11 Case were converted to a Chapter 7 case under the Bankruptcy Code and the Assets were liquidated by a Trustee in bankruptcy (the "Liquidation Value" of such Assets). The Liquidation Value would consist of the net proceeds from the disposition of Debtor' Assets and would be augmented by any Cash held by Debtor. As detailed in the Liquidation Analysis attached to the Disclosure Statement as Exhibit "B", the Debtor' Liquidation Value would not allow holders of Allowed General Unsecured Claims to receive any distribution. In contrast, the Debtor' Plan proposes to make a $20,000 distribution to the holders of Allowed General Unsecured Claims. Additionally, Setai Venture would receive less in a Chapter 7 liquidation case than the amount to be paid pursuant to the Plan. Based on the foregoing, Distributions under the Plan will provide at least the same recovery to holders of Allowed Claims against the Debtor on account of such Allowed Claims as would distributions by a Chapter 7 Trustee.

### ARTICLE IX
### RETENTION OF JURISDICTION

### 9.1    Matters Over Which Court Shall Retain Jurisdiction

The Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Code and for, among other things, the following purposes:

(a)    to hear and determine pending applications for the assumption or rejection of Executory Contracts or unexpired leases, if any are pending, and the allowance of Claims resulting therefrom;

(b)    to determine any and all adversary proceedings, motions, applications and contested

matters and other litigated matters pending on the Confirmation Date;

(c)      to hear and determine all Actions, including, without limitation, Actions commenced by the Debtor or any other party in interest with standing to do so, pursuant to sections 505, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553 of the Code, collection matters related thereto, and settlements thereof;

(d)      to hear and determine any objections to or the allowance, classification, priority, compromise, estimation or payments of any Administrative Claims, Claims or Equity Interests;

(e)      to ensure that Distributions to holders of Allowed Claims are accomplished as provided in the Plan;

(f)      to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(g)      to issue such orders in aid of execution and consummation of the Plan, to the extent authorized by section 1142 of the Code;

(h)      to consider any amendments to or modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in the Plan, the Plan supplement, or any order of the Court, including, without limitation, the Confirmation Order;

(i)      to hear and determine all applications for compensation and reimbursement of expenses of Professionals under sections 330, 331, and 503(b) of the Code;

(j)      to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan;

(k)      to recover all Assets of the Debtor and Property of the Estate, wherever located;

(l)      to determine any Claim of or any liability to a governmental unit that may be asserted as a result of the transactions contemplated herein;

(m)      to enforce the Plan, the Confirmation Order and any other order, judgment, injunction or ruling entered or made in the Case, including, without limitation, injunction, exculpation and releases provided for in the Plan;

(n)      to take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation; and

(o)      to enter a Final Decree closing the Case; *provided however,* that nothing in the Plan shall divest or deprive any other court or agency of any jurisdiction it may have over the Reorganized Debtor under applicable environmental laws

## ARTICLE X
## OTHER PROVISIONS

10.1    **Effectuating Documents and Further Transactions**

The Debtor or Reorganized Debtor, as the case may be, are authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to implement, effectuate and further evidence the terms and conditions of the Plan and any notes or securities issued pursuant to the Plan.

10.2    **Post-Effective Date Fees and Expenses**

From and after the Effective Date, the Reorganized Debtor shall, in the ordinary course of business and without the necessity for any approval by the Court, pay the reasonable fees and expenses of Professionals thereafter incurred by the Reorganized Debtor, including, without limitation, those fees and expenses incurred in connection with the implementation and consummation of the Plan.

**10.3    Payment of Statutory Fees**

The Debtor or Reorganized Debtor shall be responsible for timely payment of fees incurred pursuant to 28 U.S.C. § 1930(a)(6). After confirmation, the Reorganized Debtor shall file with the Court and serve on the United States Trustee a quarterly financial report regarding all income and disbursements, including all plan payments, for each quarter (or portion thereof) the Case remains open.

**10.4    Amendment of Modification of Plan**

Alterations, amendments or modifications of the Plan may be proposed in writing by the Debtor at any time prior to the Confirmation Date in conformity with section 1127(a) of the Code, provided that the Plan, as altered, amended or modified, satisfies the conditions of sections 1122, 1123 and 1129 of the Code, and the Debtor shall have complied with section 1125 of the Code. The Plan may be altered, amended or modified by the Debtor at any time after the Confirmation Date in conformity with section 1127(b) of the Code, provided that the Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Code and the Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under section 1129 of the Code and the circumstances warrant such alterations, amendments or modifications. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

**10.5    Severability**

In the event that the Court determines, prior to the Confirmation Date, that any provision in the Plan is invalid, void or unenforceable, such provision shall be invalid, void or unenforceable with respect to the holder or holders of such Claims or Equity Interests as to which the provision is determined to be invalid, void or unenforceable. The invalidity, vividness or unenforceability of any such provision shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan. The Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such

term or provision shall then be applicable as altered or interpreted. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 10.6    Revocation

The Debtor reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtor revoke or withdraw the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Actions by or against the Debtor or any other Person, an admission against interests of the Debtor, nor shall it prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Debtor.

### 10.7    Binding Effect Notices

The Plan shall be binding upon and inure to the benefit of the Debtor, the holders of Claims and Equity Interests, and their respective successors and assigns, including, without limitation, the Reorganized Debtor.

### 10.8    Notices

All notices, requests and demands to or upon the Debtor or the Reorganized Debtor to be effective shall be in writing and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

**If to the Reorganized Debtor:**

Wilson Manifolds, Inc.
Attn: Keith Wilson
4700 NE 11th Ave.
Oakland Park, FL 33334

**With a copy to:**

Hoffman, Larin & Agnetti, P.A.
Attn: Michael S. Hoffman, Esq.
909 North Miami Beach Boulevard, Suite #201
North Miami Beach, FL 33162
mshoffman@hlalaw.com

Unless otherwise indicated, all notices, requests or demands to the holder of any claim or interest shall be made to the address provided in such claimant or interest holder's Proof of Claim or in the Debtor's bankruptcy schedules.

### 10.9    Governing Law

Except to the extent the Code, Rules or other federal law is applicable, or to the extent the Plan or any agreement entered into pursuant to the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida, without giving effect to the principles of conflicts of law of such jurisdiction.

### 10.10   Withholding and Reporting Requirements

In connection with the consummation of the Plan, the Debtor or the Reorganized Debtor, as the case may be, shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements.

### 10.11   Section 1125(e) of the Code

As of the Confirmation Date, the Debtor shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Code. As of the Confirmation Date, the Debtor and its respective members, officers, directors, agents, financial advisors, attorneys, employees, equity holders, partners, affiliates and representatives shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Code in the offer and issuance of the new securities hereunder, and therefore are not, and on account of such offer, issuance and solicitation shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections hereof or other offer and issuance of new securities under the   Plan.

### 10.12   No Admissions

Notwithstanding anything in the Plan to the contrary, nothing contained in the Plan shall be deemed as an admission by any Person with respect to any matter set forth in the Plan or herein.

### 10.13   Waiver of Bankruptcy Rule 3020(e) and 7062

The Debtor may request that the Confirmation Order include (a) a finding that Rules 3020(e) and 7062 shall not apply to the Confirmation Order; and (b) authorization for the Debtor to consummate the Plan immediately after entry of the Confirmation Order.

### 10.14   Time

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Court, the provisions of Rule 9006 shall apply.

### 10.15   Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Code.

### 10.16   Final Decree

Once there has been Substantial Consummation of the Plan, the Reorganized Debtor shall file a motion with the Court to obtain a final decree to close the Case.

**10.17   Inconsistency**

In the event of any inconsistency between the Plan, any Exhibit to the Plan or any other instrument or document created or executed pursuant to the Plan, the Plan shall govern.

**10.18   No Interest or Attorneys' Fees**

Except as otherwise provided under the Plan, or as ordered by the Court, no interest, penalty or other charge, including any late charge, arising from and after the Petition Date, an no award or reimbursement of any attorneys' fees or other related cost or disbursement, shall be allowed on, or in connection with, any Claim, unless otherwise provided under the Plan or awarded by the Court.

**10.19   Successors and Assigns**

This Plan and all the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

**10.20   Headings**

The headings of articles, paragraphs and sub-paragraphs in this Plan are inserted for convenience only and shall not affect the interpretation of any provision of this Plan.

**10.21   No Penalty for Prepayment**

Neither the Debtor nor the Reorganized Debtor shall be liable for payment of any sum or interest in the form of a penalty relating to the prepayment of any claim treated under this Plan.

**10.22   Savings Clause**

Any minor defect or inconsistency in the Plan may be corrected or amended by the Confirmation Order.

**10.23   Remedy of Defects**

After the Effective Date, the Reorganized Debtor may, with approval of the Court, and so long as it does not materially and adversely affect the interests of Creditors, remedy any defect or omission or reconcile any inconsistencies in the Plan or in the Confirmation Order in such manner as may be necessary to carry out the purposes and effect of the Plan and in form and substance satisfactory to the Reorganized Debtor.

/s/ Keith Wilson (e-filed with consent)
Wilson Manifolds, Inc.
President

Submitted by:

HOFFMAN, LARIN & AGNETTI., P.A.
Counsel for Debtor/Plan Proponents
909 North Miami Beach Blvd., Suite 201
North Miami Beach, FL 33162
Tel: (305) 653-5555; Fax: (305) 940-0090
Mshoffman@hlalaw.com

/s/ Michael S. Hoffman
Michael S. Hoffman
Florida Bar No.:  41164

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                               Case No. 18-21658-RBR

WILSON MANIFOLDS, INC.,                              Chapter 11

      Debtor

_____/

In re:                                               Case No. 18-21662-RBR

KEITH DONALD WILSON                                  Chapter 11

      Debtor

_____/

## JOINT STIPULATION FOR ASSUMPTION OF LEASE

Debtor, Wilson Manifolds, Inc. ("Debtor"), and Creditor, TCF Equipment Finance, a division of TCF National Bank ("TCF"), by and through their respective undersigned counsel and subject to Court approval, hereby stipulate to Debtor's assumption of a lease of personal property in this case and otherwise stipulate and agree as follows ("Stipulation"):

1.     The Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 157 and 1334. The statutory predicates for the relief requested in this stipulation are 11 U.S.C. §§ 361, 362, 363 and 365.

2.     Debtor and TCF are parties to that certain Lease Agreement dated March 3, 2017, as amended, pursuant to which TCF leases to Debtor: One (1) Okuma MU-8000V, 5-Axis CNC Vertical Machining Center, SN: 654.195549, together with all accessories and attachments thereto ("Equipment"). The Lease Agreement was assigned to TCF by the original lessor Connext on April 3, 2017. A true and accurate copy of the Lease and the Assignment of the Lease to TCF are attached hereto as composite Exhibit "A" ("Lease").

**EXHIBIT**

tabbies'   1

3.     Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on September 21, 2018.  Debtor remains in possession of the Equipment and continues to operate and manage its business as a debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

4.     There is currently due and owing to TCF under the Lease the sum of $250.00 in late charges that were due as of the petition date and plus monthly lease payments which have accrued and continue to accrue since the petition date, plus attorney's fees which have accrued and continue to accrue.

5.     Debtor and TCF wish to enter into a stipulation for the assumption of the Lease by Debtor as set forth herein.

6.     Upon entry of an order approving this Stipulation, the Lease shall be deemed assumed by Debtor.

7.     Debtor shall pay the $250.00 in late charges and make monthly payments to TCF in the amount of $5,000.00 commencing on December 15, 2018 and continuing on the 15th day of each and every month thereafter until November 15, 2019.  Thereafter Debtor shall make monthly payments to TCF for the next sixty (60) months in the amount of $10,261.99 commencing on December 15, 2019.  At the same time that the last of these monthly payments is due, Debtor shall pay TCF all of its attorney's fees and costs which TCF has incurred in connection with the Lease and this bankruptcy case.  Debtor shall otherwise fully comply with the terms of the Lease.  Time is of the essence with respect to Debtor's obligations to make all of these payments.

8.     No later than December 15, 2018, Debtor will provide proof of insurance to TCF as required by the terms of the Lease.

2

9.      If Debtor defaults in the performance of any of the terms of this Stipulation or the

Lease, TCF will provide written notice of the default to Debtor's counsel by email at

mshoffman@hlalaw.com.  Debtor will then have ten (10) days in which to cure the default.

Should Debtor fail to timely cure the default, such failure shall constitute cause for granting TCF

relief from the automatic stay on an expedited basis to pursue all of its rights and remedies in the

Equipment under the Lease and applicable law.

DATED:  December 7, 2018.

/s/ Michael A. Tessitore
MICHAEL A. TESSITORE, ESQ.
Florida Bar No. 948039
mtessitore@morankidd.com
Moran Kidd Lyons & Johnson, P.A.
111 N. Orange Ave., Suite 900
Orlando, Florida 32801
407-841-4141
407-841-4148 (fax)
Counsel for Creditor, TCF Equipment
Finance

/s/ Michael S. Hoffman
MICHAEL S. HOFFMAN, ESQ.
Florida Bar No. 41164
Mshoffman@hlalaw.com
Hoffman, Larin & Agnetti, P.A.
909 North Miami Beach Blvd #201
Miami, FL 33162
(305) 653-5555

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served
electronically or by United States Mail on the 7th day of December 2018 on the following:

U.S. Trustee
Office of the U.S. Trustee
51 S.W. 1st Ave., Suite 1204
Miami, FL 33130

Debtor
Wilson Manifolds, Inc.
4700 NE 11th Ave.
Oakland Park, FL 33334

Michael S. Hoffman, Esq.
Hoffman, Larin & Agnetti, P.A.
909 North Miami Beach Blvd #201
Miami, FL 33162

/s/ Michael A. Tessitore



**Lease Agreement**

Lease Number: 004633-001

101 W. Washington St. - Suite 1140 East, / Indianapolis, IN 46204
317-781-4682 / fax: 317-781-5698 / toll free 1.866.781.4682
www.connextfinancial.com

| | |
|---|---|
| Lessee: | Wilson Manifolds, Inc. |
| Street Address, City, State, Zip: | 4700 NE 11th Street, Oakland Park, FL  33334 |
| Billing Address: | 4700 NE 11th Street Oakland Park, FL  33334 |
| Location of Equipment: | 4700 NE 11th Street, Oakland Park, FL 33334 |
| Lessee's State of Formation/ Incorporation: | Florida |

## Equipment Information

| Description | Equipment Cost |
|---|---|
| Okuma MU-8000V 5-Axis CNC Vertical Machining Center | |

| | |
|---|---|
| Total Equipment Cost: | $668,000.00 |
| Trade In: | $100,000.00 |
| **Total Finance Amount:** | **$568,000.00** |

## Lease Schedule

| Initial Term of Lease (In Months) | Total # of Lease Payments | Amount of each Lease Payment (Plus Applicable Tax) | Advance Payments | Purchase Option |
|---|---|---|---|---|
| 72 | 72 | $9,384.00 | 0 | $1.00 |

## Additional Provisions:

## Terms & Conditions

1. BY SIGNING THIS LEASE, LESSEE ACKNOWLEDGES AND AGREES THAT: LESSEE HAS READ AND UNDERSTANDS THE TERMS AND CONDITIONS ON THE ATTACHED PAGES OF THIS LEASE; THIS LEASE BECOMES EFFECTIVE ONLY UPON WRITTEN ACCEPTANCE BY AN AUTHORIZED EMPLOYEE OF LESSOR; THIS IS A NET LEASE; LESSEE CANNOT TERMINATE OR CANCEL THIS LEASE; LESSEE HAS AN UNCONDITIONAL OBLIGATION TO MAKE ALL PAYMENTS DUE UNDER THIS LEASE; LESSEE CANNOT WITHHOLD, SET OFF OR REDUCE SUCH PAYMENTS FOR ANY REASON; LESSEE WILL USE THE EQUIPMENT ONLY FOR BUSINESS PURPOSES; THE PERSON SIGNING THIS LEASE HAS THE AUTHORITY TO DO SO AND TO GRANT THE POWER OF ATTORNEY SET FORTH HEREIN; LESSEE ENTERED INTO THIS LEASE RATHER THAN PURCHASE THE EQUIPMENT. THIS LEASE SHALL BE GOVERNED BY THE LAWS OF THE STATE OF OHIO; AND TO THE NON-EXCLUSIVE JURISDICTION OF ANY COURT LOCATED IN THE STATE OF OHIO. THE LESSEE EXPRESSLY WAIVES (AS HAS THE LESSOR) ANY RIGHT TO A TRIAL BY JURY TO THE EXTENT PERMITTED BY APPLICABLE LAW.

| | |
|---|---|
| Lessor:  Connext Financial Ltd. | Lessee: Wilson Manifolds, Inc. |
| Authorized Signature: | Authorized Signature:  X |
| Print Name:  Dietmar Park | Print Name:  Keith Wilson |
| Title:  VP | Title:  President |
| Date:  03.3.2017 | Date:  3/3/17 |

**Composite Exhibit "A"**

**2. LEASE.** Lessee agrees to Lease from Lessor and Lessor agrees to lease to Lessee the Equipment identified above and/or on the Schedule A attached to and made a part of this Lease.

**3. NO WARRANTIES.** LESSOR IS LEASING THE EQUIPMENT TO THE LESSEE "AS-IS, WHERE IS AND WITH ALL FAULTS." LESSEE ACKNOWLEDGES THAT LESSOR DOES NOT MANUFACTURE THE EQUIPMENT, LESSOR DOES NOT REPRESENT THE MANUFACTURER OR THE SUPPLIER, AND LESSEE HAS SELECTED THE EQUIPMENT AND SUPPLIER BASED UPON LESSEE'S OWN JUDGMENT. LESSOR DOES NOT MAKE AND HEREBY DISCLAIMS ANY AND ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, USE OR OTHERWISE. LESSEE AGREES THAT REGARDLESS OF CAUSE, LESSOR IS NOT RESPONSIBLE FOR AND LESSEE WILL NOT MAKE ANY CLAIM AGAINST LESSOR FOR ANY DAMAGES ARISING FROM OR RELATED TO THE EQUIPMENT, WHETHER CONSEQUENTIAL, DIRECT, SPECIAL, OR INDIRECT. LESSEE AGREES THAT NEITHER SUPPLIER NOR ANY SALESPERSON, EMPLOYEE OR AGENT OF SUPPLIER IS LESSOR'S AGENT OR HAS ANY AUTHORITY TO SPEAK FOR LESSOR OR TO BIND LESSOR IN ANY WAY. LESSOR TRANSFERS TO LESSEE FOR THE TERM OF THIS LEASE ANY WARRANTIES MADE BY THE MANUFACTURER OR SUPPLIER AS TO THE EQUIPMENT.

**4. ORDERING EQUIPMENT, DELIVERY AND ACCEPTANCE.** If Lessee entered into a purchase or supply contract with any Supplier (as such term is defined in Article 2A of the UCC), Lessee assigns to Lessor Lessee's rights under the supply contract, but none of Lessee's obligations, except for the obligation to pay for the Equipment if it is accepted by Lessee according to the terms of this Lease. The Equipment is to be delivered at Lessee's expense to the location specified on the front page of this Lease and the Equipment shall be deemed to have been inspected and accepted by Lessee for all purposes under this Lease upon the date indicated as the date of acceptance on an Acceptance Certificate executed by Lessee and delivered to Lessor (the "Commencement Date").

**5. TERMINATION BY LESSOR.** Lessor shall have the exclusive option to terminate this Lease if within 90 days after Lessee has signed this Lease, the Equipment has not been delivered to Lessee, or Lessee has not accepted the Equipment as provided in section 4.

**6. TERM AND LEASE PAYMENTS.** The term of this Lease shall commence on the Commencement Date and shall continue for the number of months specified on the front of this Lease under "Initial Term of Lease" from the Commencement Date, unless cancelled, terminated or extended as provided herein. Lessee agrees to pay to Lessor the Amount of Each Lease Payment as indicated on the front of this Lease plus all applicable Taxes beginning on the Commencement Date and continuing on the same date of each successive month thereafter (the "Lease Payment"). Lessee agrees to pay to Lessor all Lease Payments and other amounts due under this Lease in advance except as stated herein, provided, any Advance Payment as set forth on the front of this Lease shall be paid upon Lessee's execution of this Lease. All Lease Payments and other amounts due shall be paid to Lessor at the address provided above for Lessor or at such other place, as Lessor shall specify in writing without invoice or other written demand. Time is of the essence of the payment and performance by Lessee of its obligations hereunder. If any payment due under this Lease is not paid when due, Lessee shall pay Lessor a late charge of 5% of each late payment. Lessee acknowledges and agrees that certain Lessee obligations, including, but not limited to, providing insurance and indemnification obligations commence prior to the Commencement Date and may be binding on Lessee whether or not the Equipment is accepted.

**7. EQUIPMENT LOCATION; USE AND REPAIR; AND RETURN.** Lessee will keep and use the Equipment only at the Equipment Location shown on the front of this Lease. Lessee may not move the Equipment without Lessor's prior written consent. Lessee will operate the Equipment in accordance with any applicable manufacturers' manuals by competent and duly qualified personnel only, in accordance with applicable requirements of law, if any, and for business purposes only. At Lessee's own cost and expense, Lessee will keep the Equipment in good repair, condition and working order and will maintain and use the Equipment in a prudent, businesslike manner for its originally-intended purpose only in accordance with applicable laws, warranty provisions, requirements of insurance, operating manuals, rules regulations, and orders of any judicial, legislative or regulatory body having power to supervise or regulate the use, operation or maintenance thereof, including licenses, permits and registration requirements and operating manuals and instructions. Lessee shall not modify or alter the Equipment without Lessor's prior written consent, which such consent shall not be unreasonably withheld. Any alterations, additions and replacements will become part of the Equipment and Lessor's property at no cost or expense to Lessor, but Lessor may require Lessee to remove any addition and repair such Equipment upon return. Lessor or any agent of Lessor may inspect the Equipment at any reasonable time. Lessee shall mark and identify the Equipment with all information and in such manner as Lessor or its assigns may request from time to time and replace promptly any such markings or identification which are removed, defaced or destroyed. Unless Lessee purchases the Equipment at the end of this Lease, Lessee will immediately deliver the Equipment to Lessor to any location in the United States that Lessor specifies in writing to Lessee and the Equipment shall be in the same condition as of the Commencement Date (ordinary wear and tear resulting from proper use excepted). Lessee shall also provide a letter from the manufacturer certifying that

the Equipment has been inspected and tested and meets all current specifications of the manufacturer and is in compliance with all pertinent governmental and regulatory rules, laws or guidelines for its operation or use. Lessee will pay all expenses of de-installing, crating, and shipping. Lessee shall insure the Equipment for its full replacement cost during shipping. In addition to Lessor's other rights and remedies, Lessee shall continue to pay to Lessor prorated Lease Payments as holdover rent for the period of time until redelivery or repair of the Equipment if the Equipment is not returned immediately to Lessor as required by this Lease or if repairs are necessary to place any items of Equipment in the condition required herein. Lessor's acceptance of such holdover rent shall not constitute an extension of the term of the Lease or a waiver of the Default resulting from Lessee's failure to return the Equipment in proper condition as required hereby.

**8. TAXES.** Lessee agrees to pay when due or reimburse Lessor, if requested by Lessor, and indemnify and hold Lessor harmless, on an after-tax basis, from, all taxes and fees arising from or relating to the Equipment and this Lease (including, but not limited to sales, use, personal property, excise, gross receipts, franchise, stamp and all other taxes, fees and assessments now or hereafter imposed and all license and registration fees now or hereafter imposed by any governmental body or agency upon the Equipment or its use, purchase, ownership, delivery, leasing, possession, storage, operation, maintenance, repair, return or other disposition of the Equipment, or for billing or registering the Equipment) or otherwise in connection with the transactions contemplated by this Lease, however, excluding all taxes on or measured by the net income of Lessor (collectively "Taxes"). Sales or use tax due upfront will be payable over the term of the Lease with a finance charge. Lessee shall prepare and file all tax returns relating to taxes for which Lessee is responsible hereunder which Lessee is permitted to file under the laws of the applicable taxing jurisdiction. Upon the expiration or earlier termination of the Lease, Lessee shall pay to Lessor any taxes accrued or assessed but not yet due and payable of that may be a potential exposure to Lessor in Lessor's sole discretion. Lessee agrees to keep or cause to be kept and made available to Lessor any and all necessary records relevant to the use of the Equipment and aforesaid Taxes and to mail a copy to Lessor concurrently with the filing thereof satisfactory evidence that such Taxes have been paid.

**9. PURCHASE OPTION; AUTOMATIC RENEWAL.** If no Default or event that with notice or lapse of time would become a Default under this Lease exists, Lessee may exercise the Purchase Option shown on the first page of this Lease at the end of the Initial Term or any renewal term to purchase all (but not less than all) of the Equipment, plus any applicable Taxes. Lessee must give Lessor at least 90 days, but not more than 180 days, irrevocable written notice before the end of the Initial Term that Lessee will (i) exercise the Purchase Option for the Equipment; or (ii) that Lessee will return all (but not less than all) Equipment to Lessor (the "End of Term Notice"). If Lessee does not timely give Lessor the End of Term Notice, this Lease will automatically renew for an additional 3 month term and thereafter renew until a date which is ninety (90) days after the date Lessor receives the End of Term Notice provided that, if this Lease contains a $1-Purchase Option Lessee will be deemed to have exercised Lessee's option to purchase the Equipment as of the Commencement Date without providing an End of Term Notice to Lessor. During such renewal(s), the Amount of each Lease Payment will remain as provided herein. If the Fair Market Value ("FMV") Purchase Option has been selected, Lessor will use Lessor's judgment to determine the Equipment 's FMV in Lessor's sole discretion, FMV shall mean the retail not wholesale price that a willing buyer (neither a lessee in possession nor a used equipment dealer) would pay for the Equipment in an arm's length transaction to a willing seller under no compulsion to sell assuming the Equipment is in the condition required when returned under the Lease. Upon payment of the Purchase Option price to Lessor plus all applicable Taxes, Lessor shall transfer it's interest in the Equipment to Lessee "AS IS, WHERE IS AND WITH ALL FAULTS" without any representations or warranties whatsoever, including merchantability or fitness for a particular purpose and this Lease will be cancelled.

**10. REPAIR, LOSS OR DAMAGE; CASUALTY VALUE.** Lessee shall bear all risk of loss associated with an item of Equipment, including the theft, destruction, or damage. No such loss shall relieve Lessee from any of its obligations under this Lease. In the event of any loss or damage with respect to particular Equipment, Lessee shall immediately notify Lessor of such loss or damage and as directed by Lessor, in Lessor's sole discretion either, (a) place such Equipment in good repair, condition and working order, (b) replace such Equipment with like equipment (of the same year, make, model and accessories) in good repair, condition and working order and of equal utility and value, or (c) pay to Lessor the "Casualty Value" which will equal the total of (i) all Lease Payments and other amounts, if any, due from Lessee to Lessor at the time of such payment, (ii) each future Lease Payment due discounted at 3% per annum, assuming a three hundred sixty (360) day year, from the date due to the date of such payment, (iii) the anticipated FMV of the Equipment as of the expiration of the Initial Term or any renewal thereof as determined by Lessor, and (iv) any other amount necessary for Lessor to realize the benefit of its bargain.

**11. INSURANCE.** Lessee shall, at Lessee's sole cost and expense, commencing with the delivery or shipment of any Equipment to Lessee and continuing during the entire term of this Lease until Lessee's obligations with respect this Lease are satisfied in full, procure and maintain such insurance coverage in such amounts and with responsible insurers, all as satisfactory to Lessor (which may on reasonable notice require Lessee to change such form, amount or company), including; (a) comprehensive general liability insurance insuring against liability for property

**Lessee has reviewed this page and certifies that each of the provisions set forth is clear and legible.**

Page 2 of 4

Lessee initials X KW

damage, death and bodily injury resulting from the Equipment, with minimum limits of $1,000,000 per each occurrence, with Lessor and Lessor's successors and/or assigns named as additional insured; (b) all risk physical damage insurance against all risks of theft, loss or damage from every cause whatsoever in an amount not less than the greater of the full replacement cost of each item of Equipment or the Casualty Value, with Lessor and Lessor's successors and/or assigns named in a lender loss payee clause, and (c) if reasonably requested by Lessor, other or additional coverage. Lessee shall waive Lessee's rights and have Lessee's insurance carrier waive its right of subrogation against Lessor for any and all loss or damage. All policies shall contain clauses requiring the insurer to furnish Lessor with at least thirty (30) days prior written notice of any material change, cancellation, or nonrenewal of coverage and stating that coverage shall not be invalidated against Lessor or Lessor's assigns because of any violation of any condition or warranty contained in any policy or application therefor by Lessee or by reason of any action or inaction of Lessee. Lessee agrees to inform Lessor immediately in writing of any notices from, or other communications with, any insurers that may in any way adversely affect the insurance policies being maintained pursuant hereto or of any insurance claims. No insurance shall be subject to any co-insurance clause. Upon request by Lessor, Lessee agrees to deliver to Lessor evidence of compliance satisfactory to Lessor that such insurance coverages are in effect, including certificates of insurance, proper endorsements or other evidence satisfactory to Lessor. If Lessee shall fail to carry any insurance required hereunder or fail to immediately provide Lessor with satisfactory proof of coverage, Lessor (without obligation and without waiving any Default by Lessee hereunder) may do so at Lessor's sole option and at Lessee's sole cost and expense and Lessor may make a profit on the provision of any such insurance. Lessee agrees that Lessor is not a seller of insurance nor is Lessor in the insurance business and that such coverage may not cover Lessee. Lessee appoints Lessor an lessee's attorney -in-fact to request required insurance coverages, make claims, receive payments and execute and endorse all documents, checks, drafts or other instruments necessary or advisable to secure payments due under any policy contemplated hereby.

**12. DEFAULT.** Each of the following is a "Default" under the Lease (i) Lessee fails to pay any Lease Payment or other amount within ten (10) days of when due; or (ii) Lessee fails to observe or perform any other obligation, covenant or condition under this Lease or in any other agreement with Lessor or any affiliate of Lessor; or (iii) Lessee or guarantor becomes insolvent, dissolves, or assigns its assets for the benefit of creditors, or enters any bankruptcy or reorganization proceeding; or (iv) any guarantor of this Lease dies, does not perform its obligations under the guaranty or any other agreement with Lessor or its affiliates, or (v) any failure to pay, as and when due, any obligation of Lessee, whether or not to Lessor, arising independently of this Lease; or (vi) any statement, representation or warranty furnished or ever made by Lessee to Lessor shall prove to be false, misleading or unperformed or the condition of Lessee's affairs shall change so as in the opinion of Lessor to materially impair Lessor's interest or increase materially Lessor's credit risk.

**13. REMEDIES.** If a Default occurs, Lessor may do one or more of the following: (i) Lessor may cancel or terminate this Lease or any other agreement that Lessor has entered into with Lessee; (ii) Lessor may require Lessee to immediately pay Lessor , as compensation for loss of Lessor's bargain and not as a penalty, a sum equal to the Casualty Value; (iii) Lessor may require Lessee to deliver the Equipment to Lessor as set forth in section 7; (iv) Lessee agrees to pay all of Lessor's or its agents or assigns costs of enforcing Lessor's rights against Lessee including attorney's fees; (v) Lessor may repossess the Equipment or disable the Equipment without court order and Lessee will not make any claims against Lessor for damages or trespass or any other reason; and (vi) charge interest on all past due amounts at 1% per month, and (vii) Lessor or it's agent may peacefully exercise any other right or remedy available at law or in equity, including all rights under the Uniform Commercial Code. If Lessor takes possession of the Equipment, Lessor may sell or otherwise dispose of the Equipment, in bulk or in parcels, whether or not the Equipment is present at such sale and with or without notice, at a public or private sale and apply the net proceeds (after deducting all costs related to the sale of disposition of the Equipment) to the amounts that Lessee owes Lessor. Lessee agrees that if notice of sale is required by law, 10 days notice shall constitute reasonable notice. Lessee will remain liable for all amounts that are due under this Lease after Lessor has applied such net proceeds to all costs and expenses incurred by Lessor in the repossession, transportation, recovery, storage, refurbishing, advertising, repair, sale, lease, or other disposition of the Equipment or Lessor's enforcement of its rights hereunder, including attorneys' fees and brokers' fees or any other fees, costs or expenses resulting from the Default by Lessee and all amounts due hereunder. Lessor may exercise any other right or remedy at law or in equity or bankruptcy, including specific performance or damages for the breach hereof. Each remedy shall be cumulative and in addition to any other remedy referred to above or otherwise available to Lessor at law or equity. No express or implied waiver of any default shall constitute a waiver of any of Lessor's other rights.

**14. PERFORMANCE OF LESSEE'S OBLIGATIONS BY LESSOR.** If Lessee fails to make any payment or perform any act or obligation required hereunder. Lessor may, but need not, make such payment or perform such act or obligation at the expense of Lessee. Any such expense incurred by Lessor shall constitute additional rent due hereunder, shall bear interest at the rate of 18% per annum; and shall be payable by Lessee to Lessor upon demand. Such action by Lessor shall not be deemed a cure or waiver of any default by Lessee.

**15. FINANCE LEASE STATUS.** Lessor and Lessee agree that this is a "Finance Lease" as that term is defined in Article 2A of the Uniform Commercial Code as currently adopted in the State of Ohio (the "UCC") and that this Agreement is not a "Consumer Lease" or a "Consumer Transaction" as such terms are defined in the UCC. It is the intention of the parties, that this Agreement will constitute (and/or shall be treated as constituting) a "Finance Lease" , notwithstanding any determination to the contrary. Lessor and Lessee shall have all the rights and remedies of a "Lessor "and "Lessee", respectively, under a Finance Lease. By signing this Lease, Lessee agrees that either (a) Lessee has reviewed, approved, and received, a copy of the Supply Contract or (b) that Lessor has informed Lessee of the identity of the Supplier. Lessee may have rights under the Supply Contract, and Lessee may contact the Supplier for a description of those rights. TO THE EXTENT PERMITTED BY APPLICABLE LAW, LESSEE WAIVES ANY AND ALL RIGHTS AND REMEDIES CONFERRED UPON A LESSEE BY ARTICLE 2A.

**16. ASSIGNMENT.** LESSEE MAY NOT ASSIGN, SELL, TRANSFER OR SUBLEASE THE EQUIPMENT OR LESSEE'S INTEREST IN THIS LEASE. Lessor may, without notifying Lessee, sell, assign, or transfer this Lease or its rights in the Equipment. Lessor agrees that the new owner will have the same rights and benefits that Lessor has now under this Lease but not Lessor's obligations. The rights of the new owner will not be subject to any claim, defense or set -off that Lessee may have against Lessor.

**17. INDEMNITIES.** (a) Lessee agrees to indemnify, hold harmless and defend Lessor against any and all claims, demands, suits and legal proceedings of any kind, including arbitration mediation, bankruptcy and appeals (collectively "Actions") arising out of or related to the Equipment or this Lease and relating thereto and any and all penalties, losses, liabilities (including the liability of Lessee or Lessor for negligence, tort, strict liability, liability for death, injury to persons or property or environmental liability) damages, costs court's costs and all other expenses including all attorney and legal fees that are incurred by Lessor in connection with Lessor's interest in or defense of any Action or enforcement of Lessor's rights with respect to any Equipment or under the Lease (which includes fees incurred by Lessor to engage an attorney whether or not suit is filed and during any settlement negotiations or work out or to enforce or defend any of Lessor's rights). (b) Unless otherwise specified in writing by Lessor, Lessor has assumed in structuring the Lease that Lessor will be entitled to all state, federal and other income tax deductions and credits generally available to owners of property similar to the Equipment (collectively, "Tax Benefits"), in each case using such methods or elections which Lessor, in its sole discretion , may elect to use under applicable law and regulations (including accelerated cost recovery deductions and/or accelerated depreciation deductions). If, under any circumstances or for any reason whatsoever, other than as expressly set forth in this section 17 (b), Lessor shall lose or shall not be entitled to all or any portion of such Tax Benefits (a "Tax Loss"), then Lessee shall pay to Lessor, on written demand, an amount which, in Lessor's reasonable opinion, causes Lessor's after-tax economic yields and cash flows to be the same as if such Tax Loss had not occurred. A Tax Loss shall be conclusively presumed to have occurred if Lessor's tax counsel determines that Lessor is not entitled to claim all or any portion of the Tax Benefits on a federal, state or other tax return or filing. Lessee further agrees that if there is any change after the date of a Lease in any applicable law or regulations, which change will reduce Lessor's economic yields and cash flows, the Lease Payment shall be increased by an amount which, in Lessor's reasonable opinion, will maintain such economic yields and cash flows. Notwithstanding anything to the contrary in this section. Lessee shall not be required to pay Lessor the amount provided for herein if the Tax Loss shall result solely because of the occurrence of any of the following events: (i) Lessor shall fail property to claim such deduction in its income tax returns for the appropriate year and such failure to claim or to follow such procedure, as the case may be, shall preclude Lessor from claiming such deduction; or (ii) Lessor shall fail to have sufficient income to benefit from the deduction. Lessor agrees to notify Lessee promptly of any claim made by the Internal Revenue Service against Lessor in respect to any Tax Loss which relates to information which may be particularly within the knowledge of Lessor. Lessor further agrees that, Lessor will contest any Tax Loss, if so requested by Lessee in writing at least thirty (30) working days prior to the last day allowed for filing notice of such contest, provided that Lessee makes adequate provision for Lessor's indemnification and the payment of all Lessor's expenses, including attorneys' fees, in connection therewith, and a meritorious basis for such claim exists in the opinion of Lessor's tax counsel.

**18. CREDIT INFORMATION.** Lessee authorizes Lessor and its agents to obtain credit bureau reports and make other credit inquiries that Lessor determines necessary. Upon Lessee's written request, Lessor will inform Lessee whether Lessor has requested a consumer credit report and the name and address outstanding. Lessee shall at Lessor's request, deliver to Lessor, Lessee's future quarterly and annual reports of financial condition, which Lessee represents and warrants shall be prepared in accordance with generally accepted accounting principles and truly present the financial condition of Lessee. Such reports shall be prepared on a basis consistent with that of the preceding year or quarter. Lessee agrees to also deliver or cause to be delivered such other financial information as Lessor may reasonably request from time to time. Lessee hereby appoints Lessor with full power of substitution, as its agent and attorney -in fact, which is irrevocable and coupled with an interest, to (a) to execute any such instruments, financing statements, documents, agreements and filings which Lessor deems necessary to protect Lessor's interest hereunder and in the Equipment and proceeds

---

**Lessee has reviewed this page and certifies that each of the provisions set forth is clear and legible.**

Lessee initials   X   _Kw_

thereof, and (b) to apply for a certificate of title for any item of Equipment that is required to be titled under the laws of any jurisdiction where the Equipment is or may be used and/or to transfer title thereto upon the exercise by Lessor of its remedies upon a Default by Lessee under the Lease.

19.  **FURTHER ASSURANCES.**  Lessee agrees to promptly, at Lessee's expense, deliver such other reasonable documents and assurances, and take such further action as Lessor may request, in order to effectively carry out the intent and purpose of this Lease.

20.  **REPRESENTATIONS, WARRANTIES AND COVENANTS.**  Lessee represents, warrants and covenants to Lessor that: (i) the making of this Lease by Lessee is duly authorized on the part of Lessee and upon execution thereof by Lessee and Lessor shall constitute valid obligations binding upon, and enforceable against, Lessee; (ii) neither the making of this Lease nor the due performance thereof by Lessee, including the commitment and payment of the Lease Payment shall result in any breach of, or constitute a default under, or violation of, Lessee's certificate of incorporation, by-laws, or any agreement to which Lessee is a party or by which Lessee is bound ;(iii) Lessee is in good standing in its state of incorporation or formation  and in any jurisdiction where the Equipment is located , and is entitled to own property and to carry on business therein; (iv) all financial information  provided or to be provided by Lessee to Lessor is true, accurate and provides a good representation of Lessee's financial condition; (v) Lessee is solvent and has the ability to pay its debts when due; (vi) Lessee will not permit the sale or transfer of any shares of its capital stock, ownership interests or voting rights which might result in a transfer of the majority interest in the ownership or control of Lessee from the persons or entities who hold ownership or control on the date of this Lease; (vii) Lessee will not sell, transfer or dispose of substantially all of its assets ; and (viii) Lessee shall not change its state of organization, headquarters or residence without providing 30 days prior written notice to Lessor. If requested, Lessee  shall  provide Lessor a Certified Copy of it's Corporate Resolutions and or a  Certificate of Incumbency in the form provided by Lessor or such other form that Lessor deems acceptable.

21.  **OWNERSHIP.**  Unless the Lease includes a $1-Purchase Option, Lessor is the owner of the Equipment. If the Lease includes a $1-Purchase Option or is a lease intended as security. Lessee acknowledges that the Lease shall be deemed to be a conditional sales contract, any ownership Lessor has in the Equipment will be deemed transferred to Lessee upon the Commencement Date, and Lessee hereby grants to Lessor a security interest in the Equipment to secure Lessee's obligations under the Lease and authorizes Lessor to file financing statements, and amendments thereto, along with any other information required or applicable under the UCC describing the Equipment in the manner and jurisdiction or filing office in which Lessor determines best protects Lessor's interest in the Equipment. Lessee hereby ratifies and authorizes any filing made prior to its execution of this Lease.

22.  **MISCELLANEOUS.**  Lessee agrees that the terms and conditions contained in this Lease make up the entire agreement between Lessee and Lessor regarding the Lease of Equipment. Lessor is not responsible for any indirect special, incidental, or consequential damages, including lost profits. The declaration of invalidity of any provision of this Lease and/or Guaranty shall not affect any part of the remainder of the provisions of this Lease and Guaranty. Any change in any of the terms and conditions of this Lease must be in writing and signed by Lessor. Any excess in the calculation of any remedy of Lessor under this Agreement is intended to cover administrative expenses of Lessor and may result in additional profit to Lessor. Lessee agrees however, that Lessor is authorized, without notice to Lessee, to insert the Lease Number, and to supply missing information or to correct obvious errors in this Lease.  Lessee  authorizes Lessor to adjust  the Amount  of Each Lease Payment by not more than 15% if either (i) the final Total Cash Price (which is all amounts Lessor has paid in connection with the purchase, delivery and installation of the Equipment, including any  soft costs, upgrade  and buyout amounts) differs from the estimated Total Cash Price, or (ii) comparable U.S. Treasury Note yields increase between the date Lessee signs this Lease and the Commencement Date. If this Lease transaction is not consummated, the Advance Payment may be retained by Lessor as partial compensation for costs and expenses incurred in preparation for the transaction. Lessor shall not be obligated to purchase the Equipment if the actual Total Cash Price varies more than 15% from the Total Cash Price listed above. If Lessor delays or fails to enforce any of Lessor rights under this Lease, Lessor will still be entitled to enforce those rights at a later time. All notices shall be given in writing by the party sending the notice and shall be effective when deposited  in  the U.S. Mail or a nationally recognized overnight delivery service, addressed to the party receiving the notice at its address shown on the front of this Lease (or to any other address specified by that party in writing) with postage prepaid. All of Lessor's right and remedies, including but not limited to those set forth in Sections 8, 13, 17 and 20 herein, shall survive and remain in full force and effect and be enforceable after  the expiration or termination of the Lease for any reason. It is the express intent of the parties not to violate any applicable usury laws  or to exceed the maximum amount of time price differential or interest as applicable, permitted to be charged or collected by applicable law, and any such excess payment will be applied to Lease Payments in inverse order to maturity, and any remaining excess will be refunded to Lessee. If more than one Lessee has signed this Lease each of the Lessees agree that Lessee's liability is joint and several. LESSEE FURTHER AGREES TO PAY LESSOR AN ORIGINATION FEE ON THE DATE THE FIRST LEASE PAYMENT IS DUE TO COVER THE EXPENSES OF ORIGINATING THIS LEASE. This Lease shall be binding on the parties hereto and their respective successors and assigns and shall inure to the benefit of such successors and assigns. LESSEE MAY REQUEST A COPY OF THIS LEASE IN LARGER FONT PRIOR TO EXECUTION.

**Lessee has reviewed this page and certifies that each of the provisions set forth is clear and legible.**

Lessee initials  **X**  _____

## ASSIGNMENT

In consideration for payment of the Purchase Price set forth below, the undersigned ("Source") hereby sells, transfers and assigns to TCF Equipment Finance, a division of TCF National Bank. ("TCFEF"), its successors and assigns, all of Source's right, title and interest (including the right to receive all amounts now or hereafter owing) in and to the Contract described below, the Equipment/Collateral thereunder, and all schedules, riders, addenda, supplements, guaranties and other supporting obligations and agreements related thereto.

This Assignment is made in connection with and constitutes an "Assignment" under that certain Program Agreement, dated as of January 18, 2008, by and between Source and TCFEF (as amended from time to time, the "Program Agreement"), and this Assignment along with the Contract described herein and the Equipment/Collateral thereunder are hereby made subject to the Program Agreement. Source hereby verifies that the following information and all representations and warranties with respect to the Contract under the Program Agreement are accurate as of the date TCFEF pays the purchase price for this Assignment.

This assignment and any related documents may be delivered and/or reproduced by facsimile, optical scanning or other electronic means ("e-copy") and such e-copy or a printed version thereof shall be enforceable as an original and admissible as such in any court or other proceeding.

### CONTRACT:

|  |  |
|---|---|
| Lessee: | Wilson Manifolds, Inc. |
| Lease Number: | 004633-001 |
| Lease Date: | 03/03/2017 |
| Name of Guarantors (if any): | Keith Wilson |
| Total Number of Payments: | 72 |
| Assigned Number of Payments: | 72 |
| Next Payment Due Date: | May 1, 2017 |
| Monthly Payment Amount: | 72 payments @ $9,547.26 |

### EQUIPMENT/COLLATERAL
Description:   Okuma MU-8000V 5-Axis CNC Vertical Machining Center

### PURCHASE OF CONTRACT

Total Purchase Price: $593,841.59
$682,350.00 (less down deposit of $100,000.00 total amount of $582,350.00 due) to Gosiger Southeast
$11,491.59 to CONNEXT

Source: Connext Financial Ltd.

| | |
|---|---|
| **By:** | _(signature)_ |
| **Name:** | Du'Weena Jordan |
| **Its:** | VP of Operations |
| **Dated:** | 4/3/2017 |

Version 09.16.2016



# Notice of Assignment and to Re-Direct Payment

**Wilson Manifolds, Inc.**
**4700 NE 11th Street**
**OAKLAND PARK, FL 33334**

RE:     Wilson Manifolds, Inc., Contract No. <u>004633-001</u>, dated 3/3/2017 by and between <u>Wilson Manifolds, Inc.</u>, as "Lessee" and <u>Connext Financial Ltd</u>, as "Lessor" (the "Lease")

Lessee is hereby notified that all right, title and interest of Lessor in and to the Lease, the remaining rentals due under the Lease, the equipment leased thereunder (the "Equipment") and the rights and remedies of Lessor under the Lease, have been assigned to TCF Equipment Finance, a division of TCF National Bank ("TCFEF"). Pursuant to the assignment provisions of the Lease, **you are hereby directed to pay any and all rents, late charges and any other amounts now or hereafter due under the Lease to TCFEF at the following address, or to such other person or address as TCFEF may subsequently direct**:

> TCF Equipment Finance, a division of TCF National Bank
> P.O. Box 77077
> Minneapolis, MN 55480

Under Section 9-406(a) of the Uniform Commercial Code, on or after the date of this Notice, only payments made to TCFEF will discharge or reduce your obligations under the Lease, and any payment to Lessor will **not** constitute a payment under the Lease. In addition, Lessee shall deal solely with TCFEF with respect to the Lease and the Equipment. Lessor has no right to enter into any amendment of or waiver related to the Lease without the prior written consent of TCFEF and any such amendment, waiver or accommodation will be void without such consent.

All questions related to this Notice or your Lease should be directed to TCFEF at 1-866-311-2755.

Sincerely yours,

Connext Financial Ltd.

By:     _____

Date:     4/3/2017    _____

Version 09.16.2016